UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA ex rel. KENNETH KARLIN, <br><br>                           Plaintiff, <br><br>     v. <br><br> NOBLE JEWELRY HOLDINGS LIMITED, DAVID G. LLC formerly known as CHAD ALLISON DESIGNS, LLC, CHAD ALLISON CORPORATION, NOBLE JEWELRY LIMITED and JOHN DOES 1-100, <br><br>                           Defendants. | No. 08 Civ. 7826 (JGK) <br><br> Filed Via ECF <br><br><br> SUPPLEMENTAL DECLARATION OF MARK A. STRAUSS IN FURTHER SUPPORT OF RELATOR'S MOTION FOR ATTORNEYS' FEES, COSTS AND EXPENSES |

I, MARK A. STRAUSS, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a partner in the firm of Kirby McInerney LLP.

2. I was actively involved in the prosecution of this case, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and active participation in all material aspects of the action.

3. I respectfully submit this supplemental declaration in further support of Relator's motion for an award of attorneys' fees, costs and expenses incurred during the prosecution of this *qui tam* action.

**Detailed Billing Report**

4. The schedule attached hereto as Exhibit A is the Slip Detail Listing generated by Timeslips, the computerized daily time record system used by my firm. This report documents the hours billed by my firm in this case. It lists each time entry that was made, the identity of the biller,

the date, the hours expended, and the nature of the work performed. All of the time indicated in the report was contemporaneously recorded in the regular course of business.

     5.     Attached as Exhibit B is a schedule reflecting my firm's 2011 billing rates.

     6.     Attached as Exhibit C is a revised and corrected schedule summarizing my firm's lodestar in this case. The summary shows the total amount of time spent by each attorney and professional support staff of my firm who was involved in this litigation, and the aggregate lodestar calculation. This summary was prepared using the Timeslips records contained in Exhibit A. The summary employs the billing-rate methodology advocated by defendants, *i.e.*, each attorney's rate has been determined based on his or her average level of experience over the time period on which he or she worked on the litigation. The summary uses the rates set forth in Exhibit B.

     7.     The lodestar summary has been corrected to reflect the elimination of two erroneous time entries (totaling 5.5 hours), and the discretionary removal of eight hours of attorney time and 28.75 hours billed by a filing clerk who no longer works for the firm.

     8.     The changes set forth above reduce Relator's fee request by $19,556.25.

     9.     Based on the foregoing exhibits, the total revised number of hours expended on this litigation by my firm through September 12, 2011 is 663.75. The total lodestar for my firm is $281,511.25, consisting of $269,206.25 for attorneys' time and $12,305 for professional support staff time.

**Chronology of Significant Work Performed by Relator's Counsel**

     10.     To supplement and verify the information set forth in Exhibits A-C, we have prepared a detailed narrative chronology describing the work performed by us in this case. The chronology has been prepared based on contemporaneous records maintained by my firm, *i.e.*, emails,

memoranda, correspondence and research files.

11.     Relator retained us in connection with this case in January 2008. Upon being retained, we proceeded to extensively debrief Relator as to the matters at issue. We also examined and analyzed the documentation and other information that he provided, and conducted an extensive factual and legal investigation into the potential False Claims Act ("FCA") claims. Our work included, without limitation;

      a. Research regarding reverse FCA claims;

      b. Research regarding conspiracy claims under the FCA;

      c. Analysis of potential damages and/or penalties;

      d. Research regarding the applicable customs and import procedures, practices, regulations and requirements;

      e. Research and analysis with respect to the U.S. Harmonized Tariff Schedule in connection with the importation of the subject goods during the time period in question;

      f. Research with respect to the issue of "transaction value" for duty purposes in "related party" transactions, *see* 19 CFR §152.102(g);

      g. Investigation of publicly available information regarding defendants' exports to the United States, including through an analysis of foreign regulatory disclosures and filings;

      h. Investigation of the incorporation and other public filings relating to defendants and their affiliates in California, New York, Delaware and Nevada;

      i. Investigation of certain employees and former employees of defendants;

      j. Investigation of records and filings potentially relating to defendants and their affiliates in the Court of International Trade;

      k. Research regarding potential whistleblower provisions available to Relator other than the FCA, *e.g.*, under the U.S. customs laws;

       l.      Research and review of decisions and pleadings in other cases involving the underpayment of customs duties, including actions brought under the FCA;

       m.      Extensive interviews with Relator and analysis of the documents provided by him;

       n.      Factual and legal investigation with respect to the potential inclusion of additional defendants, *e.g.*, customs brokers used by defendants;

       o.      Preparation of the detailed complaint; and,

       p.      Preparation of the detailed disclosure statement.

12.    In or about June 2008, we contacted the United States Attorney's Office ("USAO") in connection with the anticipated filing of the complaint. Shortly thereafter, on or about June 11, 2008, we provided the USAO with a drafts of the proposed complaint and disclosures statement and supporting documentation.

13.    In or about July 2008, we conferred with the Government regarding the proposed complaint and disclosure statement. Based on those discussions, we revised the complaint, but held its filing in abeyance.

14.    On or about September 5, 2008, after further discussions with the Government, we obtained an order from the Court authorizing the filing of the complaint *in camera* and the withholding of the issuance of the summons and place the complaint under seal.

15.    On September 8, 2008, we filed the complaint pursuant to the order. The next day, we formally served the disclosure statement on the Government.

16. On October 30, 2008, after extensive preparation of the Relator, we and Relator met with the Government as well as several of its agents and investigators. The meeting lasted several hours and Relator provided the Government with substantial information.

17. Following the meeting with the Government, we prepared and provided a two-page, single-spaced letter, dated November 6, 2008, to the Government. The letter contained follow-up evidence and information designed to assist the investigation. The letter also included evidentiary materials from Relator.

18. Thereafter through 2010, we conferred with the Government on numerous occasions by email and telephone regarding the status of, and developments in, the Government's investigation. This included discussions in February, September and November, 2009, and February, May and October, 2010.

19. Then, in mid-October, 2010, we received a request from the Government for certain factual information from Relator in order to assist it in its investigation. After consulting with Relator, we provided the Government with a detailed response. Shortly thereafter, in December 2010, we arranged for the Government's agents to meet directly with Relator in the field.

20. On December 7, 2010, we and Relator participated in another extensive in-person meeting with the Government and its investigators. The meeting related to information uncovered during the course of the Government's investigation as to which the Government sought Relator's assistance.

21. After the meeting, we prepared and provided a detailed letter, dated December 17, 2010, to the Government with follow-up information from Relator with respect to matters discussed at the December 7, 2010 meeting.

22. On or about January 7, 2011, we again conferred with the Government on the status of and developments in the investigation.

23. In February 2011, the Government contacted us and asked us to prepare a memorandum analyzing the FCA penalties that potentially could be assessed against defendants based on evidence uncovered in the course of the investigation. It was expected that the analysis could be used to bolster the Government's position in any settlement discussions.

24. We conducted the requested research, and prepared the subject memorandum. On March 17, 2011, we delivered a 16-page work-product to the Government.

25. By email dated March 21, 2011, attached as Exhibit D, the Government stated that the memorandum was "incredibly useful."

26. On March 30, 2011, we again met in person with the Government. The purpose of the meeting was to discuss the analysis set forth in our March 17, 2011, memorandum, and strategy going forward with respect to maximizing the dollar amount of any settlement with defendants.

27. Thereafter, we prepared and submitted a letter to the Government, dated April 8, 2011, with respect to Relator's specific strategy recommendations regarding settlement with defendants.

28. Through July, 2011, we were in frequent contact with the Government (and Relator) by email and telephone regarding the status of the Government's settlement discussions with defendants. This included discussions with the Government on or about April 29, 2011, May 9 and 18, 2011, June 5, 2011, and July 14, 2011.

29. On May 18, 2011, we again conferred with the Government as to the settlement negotiations and sent the Government an email analyzing an issue relating to damages.

30. On May 19, 2011, we responded to a Government request for additional factual information relevant to the investigation from Relator.

31. From early June through the filing of the settlement papers at the end of August, we were again in frequent contact with the Government regarding the progress of the settlement discussions and the back-and-forth with defendants. This included a June 5, 2011 email exchange; telephone discussions on July 14, 2011, and August 5 and 10, 2011; and an email exchange in mid-August 2011.

32. On August 10, 2011, the Government informed us that an agreement in principal to settle the claims in the action had finally been reached with defendants.

33. There ensued a series of emails and calls between us and the Government relating to the proposed settlement documents. We recommended a number of material changes to the drafts. Our comments centered on the fact that defendants planned to discharge their obligations by making a series of installment payments rather than a lump sum. We were concerned that adequate language and other protections designed to deal with and address the possibility of default or late payment be included in order to protect the taxpayers and Relator in light of this unusual feature. Although the agreement with defendants was our primary focus, conforming changes were required in the Relator's share agreement, which incorporated and tracked its material language.

34. We provided extensive redlines reflecting our proposed changes to the Government on or about August 22 and 23, 2011.

35. We spent no material amounts of time discussing the relator's share with the Government. In mid-August, the Government simply informed us what share it was authorized to award and, after conferring with Relator, we agreed to that amount. The Government informed us

7

that the amount was the maximum possibly under its practices and guidelines, and we were very pleased with it.

36. The parties finalized and executed the settlement documents on or about August 23, 2011. On August 31, 2011, the court approved the settlement. We commenced negotiations with defendants with respect to our attorneys fees, and prepared the instant motion.

**The Reasonableness of Relator's Counsel's Hourly Rates**

37. Annexed as Exhibits E and F, respectively, are schedules of recent fee awards in this district to plaintiff- and defense-side firms practicing in the area of complex commercial contingency litigation in this district.

38. Annexed as Exhibit G is a list of recent federal court fee awards granted to Relator's Counsel, together with supporting documentation.

**Billing for Online Computer Research**

39. We customarily bill clients for online computer legal research fees such as Westlaw. *See also* Exhibit G.

**Mid-Sized Law Firm**

40. We are a mid-sized law firm. We have 67 total full-time personnel. This includes 11 partners, 12 associates/of counsel, 14 staff lawyers, and 30 support staff. We employ a Managing Clerk, Information Technology Director, Financial Controller, Office Manager, and Director of Business Development. We occupy two floors at 825 Third Avenue, and maintain a second office in Texas.

**Defendants' Refusal to Provide Relator with Their Lodestar Information**

41. Annexed as Exhibit H is an email from defense counsel dated October 12, 2011.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of October 2011, at New York, New York.

*/s/ Mark A. Strauss*
Mark A. Strauss
